IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DAVID S. GRAY II, | § § § § | |
| *Plaintiff,* | § § | |
| v. | § § | No. 1:24-CV-01403-ADA |
| SAMSUNG AUSTIN SEMICONDUCTOR, LLC, | § § § § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a Motion for Summary Judgment filed by Defendant Samsung Austin Semiconductor, LLC ("Defendant" or "SAS") on February 25, 2026 (Doc. 39). Pursuant to Fed. R. Civ. P. 56, SAS seeks summary judgment on all of Plaintiff David Gray's ("Plaintiff" or "Gray") remaining claims asserted in his Complaint under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq.* ("ADA"): discrimination, failure to accommodate, hostile work environment, and retaliation.[1] With Plaintiff David Gray's Response filed March 11, 2026 (Doc. 41), SAS's Reply filed March 19, 2026 (Doc. 44), and Gray's Sur-Reply filed April 10, 2026 (Doc. 49), the motion is ripe for ruling. Having reviewed the filings, exhibits, and the governing case law, the Court now renders the following opinion and order granting SAS's motion in full, with prejudice.[2] Plaintiff's motion to alter or amend (ECF No. 63) is **DENIED**.

---

[1] Plaintiff's Complaint also alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-2(a)(1), which this Court dismissed on March 7, 2025. (Doc. 19.)

[2] Both sides submitted evidence with their briefs. With its Motion, Defendant provides an appendix (Doc. 40) with excerpts from Plaintiff's deposition transcript and related exhibits (Tabs A, B), and the Declaration of Eric Hameister (Tab C) with exhibits (C-1, C-2, C-3), and the Declaration of Matthew Green (Tab D) with exhibits (D-1, D-2, D-3, D-4.) The Court will refer to Plaintiff's transcript by Tab, page and lines, and will refer to related exhibits by their Tab and number, B-4, etc. The Court will refer to the other declarations and attached exhibits by the corresponding appendix letter and number, Ex. C-1, etc. With his Response in Opposition (Doc. 41), Plaintiff

BACKGROUND

Gray began working for SAS on March 20, 2023 as a Technician I in Manufacturing Operations, a role requiring frequent in-person communications and collaboration with other SAS personnel in time-sensitive circumstances. Tab A, 17:9-10; Tab C, ¶¶4, 10. Gray received Employee Action Notices for attendance violations on April 23, June 19, and August 29, 2023, with the August notice constituting a "final warning." Tab A, 45:5-46:25, 49:6-25, 52:3-18; Exs. B-6; B-7; B-8. Beginning in April 2023, SAS employees reported Gray engaging in unusual behaviors, including standing in a corner staring at the wall, standing in a stairwell on his phone, and wandering the hallway with headphones. Ex. C-1, pp. 1-2; Tab C, ¶¶6-7. On July 25, 2023, an SAS employee reported that Gray engaged in a confrontational outburst with another employee. Ex. C-1, p. 3; Tab A, 57:20-24. Gray's 2023 annual performance review reflected that he met minimum performance metrics, with a downward adjustment for attendance issues. Doc. 41, p. 6; Doc. 41-1, Ex. 3.

On August 2, 2023, Gray reported that a co-worker, Christian Birk ("Birk"), had photographed or videoed him with her cellular phone, and requested relocation. Tab A, 63:7-25, 70:25-72:5; Ex. B-10; Ex. C-1, p. 3. SAS investigated Gray's report but did not find evidence on Birk's cellular phone corroborating Gray's allegations. Tab A, 68:1-69:25; Tab C, ¶8. On August 11, 2023, Gray informed SAS he was legally blind in his left eye which he contended caused him to turn in Birk's direction to view his computer monitor; Gray reported that this circumstance resulted in severe anxiety and discomfort for him, following his perception that she had been recording him with her cellular phone. Tab A, 75:19-77:6; Ex. B-10. Gray asked that Birk be

---

also submitted an appendix (Doc. 41-1) containing exhibits which the Court will reference as Doc. 41-1, Ex. 1, etc. Plaintiff submitted additional documents with his Sur-Reply (Doc. 49-1), which the Court will reference as Doc. 49-1, Ex. A, etc.

permanently relocated, or that an alternative adjustment be made. Ex. B-10. Gray also informed his supervisor that he was seeking professional help for anxiety. Ex. B-10; B-11. On August 19, 2023, Gray reported visiting SAS's employee assistance mental health room regarding his interaction with Birk, but the healthcare provider was unavailable. Ex. B-11.

SAS permitted Gray to temporarily work from an adjoining room to avoid proximity to Birk. Tab A, 78:24-80:4; Ex. C-1, pp. 3-4. On August 19, 2023, Gray reported continuing stress related to his perception that Birk had recorded him, despite admitting that no subsequent events had transpired with Birk. Tab A, 83:24-85:11, 88:17-89:24; Ex. B-11, p. 2.

On September 13, 2023, Gray emailed SAS supervisor Bobbi Black ("Black") requesting to work from home or to work in unoccupied office space permanently due to "extreme stress" from his perception that Birk had recorded him. Ex. B-14, p. 4; Tab A, 103:5-104:21. SAS human resources and supervisory employees discussed his request via email, noting that because a remote work request "could be seen as a reasonable accommodation," they "may need to provide some more information as to why [Gray's] role is unable to [work from home]." Ex. B-14, pp. 3-4. In response, a supervisor noted that SAS does "not support [work from home] for specialist or technicians," and that SAS had never approved remote work as an accommodation for those roles. *Id.*

SAS's supervisors and human resources determined Gray's request to work from home was not feasible given the essential functions of his role requiring face-to-face communication in high-priority circumstances. Tab C, ¶¶4, 9-12; Ex. B-14. Nor could SAS accommodate Gray's request for a private workspace, as it did not have a space available that would still allow Gray to comply with the accessibility and face-to-face communication requirements. Tab C, ¶¶4, 9-12; Ex. B-14. Black informed Gray that SAS could not grant his request to work from home or to work in

a private area, but confirmed he could pursue a leave of absence if needed. Ex. B-15. Gray initially indicated he would pursue the option of leave. *Id.* On September 19, 2023, Gray told his supervisor that he would not request leave because it would be unpaid; he instead requested, and was approved, several days of PTO. Ex. C-1, pp. 4-5.

On October 10, 2023, another SAS employee reported that Gray had engaged in additional outbursts and had been cursing and muttering under his breath. Ex. C-1, p. 5. Black counseled Gray that SAS did not permit such conduct. *Id.* When Gray indicated his mental health had been deteriorating since the occasion in which he believed that Birk recorded him with her phone, Black offered to temporarily relocate his workstation, but Gray declined. *Id.* Gray subsequently informed a new supervisor that he suffered from obsessive compulsive disorder and required additional break time to call his doctor, which SAS accommodated. *Id.*; Tab A, 114:1-115:5.

Gray requested medical leave through SAS's third-party administrator the Prudential Insurance Company ("Prudential") in October 2023, and was approved for SAS Accommodation Leave and Short-Term Disability benefits on October 24, 2023, with a retroactive start date of September 20, 2023 and an end date of November 7, 2023. Tab A, 115:13-117:10; Ex. B-17. Gray informed Black of the approval but indicated that Prudential would need to adjust the dates, since Prudential was unaware he had been working through October 24, 2023. Ex. B-19. Black asked Gray to provide documentation confirming approval of his leave, and indicated he "should continue to come into work until [his leave dates] can be verified." Ex. B-19. Gray began medical leave on or about October 25, 2023. Tab A, 121:20-122:8; Ex. B-20.

Once on medical leave, Gray requested several extensions, which SAS granted. Tab A, 127:1-9; Ex. B-22. On December 8, 2023, Gray requested an extension through mid-January 2024, which SAS approved with an expected return to work date of January 12, 2024. Ex. B-22, pp. 9-

11. On January 9, 2024, Gray requested another extension through February 14, 2024, submitting supporting documentation from his healthcare provider. Doc. 49, p. 2; 49-1, Exs. B, E.[3] SAS responded:

> Although you were/are eligible for Short Term Disability pay and Personal Medical Leave under SAS policy, that has now exhausted as of 1/1/24. If there is no plan to return to work after the most recent approval of leave through 1/12/2024, a business decision will need to be made regarding next steps. Me and someone from our Employee Relations team will reach out soon.

*Id.* Gray responded that he would return to work "ASAP" and subsequently communicated with SAS regarding related logistics. *Id.* at pp. 1-5; Tab A, 131:6-133:5.

Gray returned to work on January 14, 2024. Tab A, 133:1-18. On January 16, 2024, an SAS supervisor reported an interaction with Gray which he described as "concerning," noting that he perceived Gray to be "visibly angry" and "extremely heated." Ex. D-3. On January 21, 2024, Gray informed a supervisor that another employee, Nathan Joseph, was annoying him by tapping his keyboard. Ex. C-1, p. 7. The following day, Gray was involved in an encounter with a different SAS employee, Julian Vasquez ("Vasquez"). Tab A, 137:11-139:4; Ex. D-4. The specifics of the encounter are disputed. What is undisputed is that several SAS employees reported that Gray engaged in a confrontational, inappropriate outburst towards Mr. Vasquez, Doc. 39, p. 8; Ex. D-4; Ex. C-1, p. 7, although Gray contends he calmly informed Mr. Vasquez that he would report Mr. Vasquez if the perceived harassing conduct continued. Doc. 41, pp. 13-14.

---

[3] In his Response Brief, Gray asserted that on December 8, 2024, Prudential approved his extension request for leave through February 14, 2024, and that SAS subsequently overrode this approval. Doc. 41, pp. 7-9. However, in its Reply Brief, SAS objected to the documentary evidence upon which Gray purportedly relied in making this allegation. Doc. 44, pp. 3-6. In his Sur-Reply, Gray admitted that he had made an error when compiling the documents that allegedly supported his assertion. As such, Gray has provided no record evidence that the leave extension had been granted by Prudential or was overruled by SAS.

Immediately thereafter, Black met with Gray about his conduct, and Gray reported for the first time that Vasquez had been annoying and antagonizing him by dropping items, typing loudly, and sticking his feet out. Ex. C-1, p. 7. Gray also reported his belief that his co-workers thought he was a "bad guy" and a "sexual deviant" and "pervert." *Id.*; Ex. D-4, p. 2. Gray also informed Black that his healthcare provider had not signed his return-to-work paperwork; Black indicated she would contact Human Resources for guidance. Ex. D-4, p. 2.

SAS placed Gray on an immediate suspension pending investigation into the encounter with Vasquez. Tab A, 144:20-145:5; Ex. C-1, p. 8; Tab D, ¶10. SAS Human Resources attempted to contact Gray via telephone and email on January 23, 2024 and January 24, 2024 to inquire about his return-to-work paperwork. Ex. B-23. Gray responded via email to inform them they had been using an incorrect phone number, but did not substantively respond to their inquiries. Tab A, 144:20-145:5. SAS investigated the January 22, 2024 encounter and, relying on the accounts of multiple employee witnesses, determined that Gray engaged in a verbal outburst and had yelled, unprovoked, during a training session with Vasquez. Ex. C-3. On January 29, 2024, SAS terminated Gray's employment, citing violations of its Code of Conduct related to the January 22, 2024 encounter with Vasquez while on a final warning for attendance, as well as Gray's previous behavior towards his co-workers. Ex. C-3.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable

6

jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Id.* When ruling on a motion for summary judgment, the court is required to view all reasonable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. The court's obligation to draw reasonable inferences does not extend so far as to allow a wholly unreasonable inference, or one which amounts to mere speculation and conjecture. *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984) (citations omitted). Further, a court "may not make credibility determinations or weigh the evidence" when ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific admissible evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to

establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## DISCUSSION

Plaintiff asserts four causes of action: (1) disability discrimination in violation of the ADA; (2) hostile work environment in violation of the ADA; (3) failure to accommodate in violation of the ADA; and (4) retaliation in violation of the ADA. (Doc. 1 at 1-6). Defendant moves for summary judgment on each claim. (Doc. 39). The Court addresses each claim in turn.

### A. Disability Discrimination

#### a. Standard

The ADA prohibits employers from discriminating against a qualified individual on the basis of disability. *Mueck v. La Grange Acquisitions, LP*, 75 F.4th 469, 483 (5th Cir. 2023) (citing 42 U.S.C. § 12112(a)). When, as here, Plaintiff's ADA claims are based on circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies. *Id.* To establish a *prima facie* case of employment discrimination under the *McDonnell Douglas* framework, a plaintiff must demonstrate: (1) he has a disability; (2) he was qualified for the job; and (3) he was subject to an adverse employment action because of his disability. *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 697, 701–02 (5th Cir. 2014); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The Court need not reach the subsequent *McDonnell Douglas* burden-shifting analysis where the plaintiff fails to establish a *prima facie* case. *Nguyen v. Univ. of Tex. Sch. of Law*, 542 Fed. App'x 320, 325 (5th Cir. 2013).

If the plaintiff carries the initial *prima facie* burden, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, after which the plaintiff bears the burden to prove that the employer's explanation was a pretext for discrimination." *Mueck*, 75 F.4th

at 483 (citation and internal quotation marks omitted); *see also Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 582 n.44 (5th Cir. 2020); *accord, Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308-309 (2025). When the employer "articulates such a justification, the plaintiff must then have a 'fair opportunity' to show that the stated justification 'was in fact pretext' for discrimination." *Ames*, 605 U.S. at 309 (quoting *McDonnell Douglas*, 411 U.S. at 804). This opportunity provides plaintiffs with two avenues to show pretext—"either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "To carry the burden of showing pretext, '[t]he plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates.'" *Mueck*, 75 F.4th at 483 (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001).

### b. Analysis

SAS argues that Gray cannot satisfy the second or third elements of his *prima facie* burden.[4] With respect to the second element, SAS argues that Gray was not qualified for his position in that he failed to meet SAS's legitimate performance expectations as to attendance and conduct. Doc. 41, p. 11-12. Employees that fail to meet performance expectations are not qualified for their position. *Arensdorf v. Geithner*, 329 Fed. App'x 514, 516 (5th Cir. 2009); *see also Swilley v. City of Houston*, 457 Fed. App'x 400 (5th Cir. 2012) (plaintiff was not qualified for her position because she was affirmatively unwilling to comply with the basic organizational mandate for her position). In support of its position, SAS identifies three employee action notices regarding

---

[4] Neither party addresses the first element of the *prima facie* case and the Court will therefore assume for purposes of addressing Defendant's Motion that Gray was disabled under the ADA.

attendance violations—including a final warning, as well as a pattern of several confrontational outbursts reported by SAS employees or supervisors on July 25, 2023, October 10, 2023, January 16, 2024, and January 22, 2024. Doc. 41, pp. 11-12. In response, Gray contends that "misconduct intertwined with a disability does not automatically eliminate ADA protection" and cites *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697, 701–02 (5th Cir. 2014). However, in *LHC Grp., Inc.*, the court found that the plaintiff failed to perform her duties to her employer's satisfaction, such as driving, patient care, and computer skills. *Id.* at 693. *LHC* does not support Gray's argument here regarding issues of conduct and misconduct. The ADA does not require SAS to tolerate Gray's misconduct merely because he happens to have a disability, even if the misconduct were related to the disability, which Gray does not clearly articulate here. *See, e.g. Bennett v. Calabrian Chemicals Corp.*, 324 F.Supp.2d 815, 825 (E.D. Tex. June 9, 2004), *aff'd*, 126 F. App'x 171 (5th Cir. 2005).

SAS further contends Gray cannot satisfy the second element because he could not perform the essential functions of his position that require in-person collaboration. Doc. 39, pp. 11-12. Gray responds by noting he met SAS's expectations with regard to technical and operational functions, which SAS does not dispute, and asserts co-worker comfort was not an essential function of his position. Doc. 41, pp. 5-6. Essential functions under the ADA extend beyond technical proficiency. *See Zavala v. Texas Lehigh Cement Co., LP*, 635 F. Supp. 3d 524, 536 (W.D. Tex. 2022) ("Even if a task is not an express part of the job description, it can still be considered an essential function of a position under the ADA if it bears more than a marginal relationship to the employee's job.") (internal citations omitted). SAS provided unrebutted evidence that the Technician I position Gray occupied was highly collaborative and required frequent, time-sensitive communications with other SAS personnel. Tab C, ¶¶4, 10. Gray has provided no competent summary judgment

evidence to the contrary from which a jury could infer that he was qualified for his position. Accordingly, Gray fails to satisfy his burden as to the second element of his *prima facie* case.

SAS contends even if Gray could prove the second element, he cannot prove the third element: that he suffered an adverse action *because of* his disability. SAS notes that several of Gray's attendance-related employee action notices pre-date his disability disclosure. Doc. 39, pp. 12-13. Gray does not address this argument, and thereby has conceded it. SAS also contends it terminated Gray's employment *both* for violations of its Code of Conduct related to the January 22, 2024 encounter as well as Gray's previous behavior towards his co-workers, while on a final warning for attendance. Ex. C-3. Gray does not set forth any evidence contrary to SAS's evidence. His subjective belief that this was not SAS's real reason for his termination is insufficient to demonstrate a causal link between his protected activity and the adverse employment action. *See, e.g., Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000) (noting that discrimination cannot be shown simply by a plaintiff's "subjective belief that [defendant] discriminated against him"). Nor has Gray identified any similarly-situated, non-disabled peer who engaged in similar conduct and was not terminated. *See* Doc. 41. Accordingly, Gray's disability discrimination claim is dismissed.

## B. Hostile Work Environment

### a. Standard

To establish disability-based harassment under the ADA, a plaintiff must prove: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability or disabilities; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt, remedial action. *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229,

11

235–236 (5th Cir. 2001). The fifth element is met where the harassment claim arises out of a supervisor's conduct. *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 453 (5th Cir. 2013) (en banc) (Title VII).

The legal standard for workplace harassment is "high." *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003). "Merely offensive conduct is not actionable." *Holmes v. N. Tex. Health Care Laundry Coop. Ass'n*, No. 3:15-CV-2117-L, 2018 WL 461127, at *14 (N.D. Tex. Jan. 18, 2018) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The alleged disability-based harassment must "be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *See Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996). In determining whether a work environment meets this standard, the Fifth Circuit considers the frequency of the alleged conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See Flowers*, 247 F.3d at 236. Occasional statements or actions do not create a hostile work environment if they are not severe, physically threatening, or humiliating, even if they are unwanted and offensive. *See Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 330–31 (5th Cir. 2009).

### b. Analysis

Gray's hostile work environment claim is based on: (1) the August 2, 2023 incident in which he perceived Birk to be recording him, Doc. 39, pp. 39-40; (2) co-workers grunting and stomping near his workspace, *id.* at 82:11–83:8; (3) Vasquez calling him a "pervert" on one or two occasions after his January 14, 2024 return from medical leave, Ex. A-2, 134:9–135:16; and (4) a single comment from his supervisor Black telling him to "find more work" and expressing what Gray perceived to be doubts about his disability. *Id.* Taking the evidence in the light most favorable

12

to Plaintiff, no reasonable juror could find that these incidents are "sufficiently severe or pervasive to alter the conditions of the victim's employment." *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009) (citations omitted); *see also Thompson v. Microsoft Corp.*, 2 F.4th 460, 471 (5th Cir. 2021) (insensitive statements like telling an employee to "seek a different career" do not give rise to a hostile-work-environment claim); *Credeur v. Louisiana Through Off. of Att'y Gen.*, 860 F.3d 785, 796 (5th Cir. 2017) (criticizing work performance and threats of termination do not satisfy the harassment standard); *Saketkoo v. Adm'rs of Tulane Educational Fund*, 31 F.4th 990, 1003–04 (5th Cir. 2021). Thus, Gray has not established harassment sufficiently severe or pervasive to support a hostile work environment claim.

Gray does not address the severity or pervasiveness requirement other than to note that the conduct resulted in his need for medical leave. Doc. 41, p. 11. This does not satisfy his burden at the summary judgment stage. An employee's "subjective physical and emotional reactions" to an employer's conduct "do not establish that the work environment would have been perceived as hostile or abusive by a reasonable employee." *Kumar v. Shinseki*, 495 Fed. App'x 541, 543. Nor does Gray establish that he took advantage of reasonable reporting methods or that SAS was aware of the alleged conduct. He does not articulate any specific instances where he reported co-workers grunting, stomping, or calling him a "pervert" prior to his January 22, 2026, meeting with Black in which he was informed of his suspension. Nor does he allege to have reported Black's comment to SAS. On the other hand, when Gray did report Birk allegedly filming or photographing him, SAS promptly investigated and permitted Gray to temporarily relocate away from Birk, even though the allegations were not substantiated. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (no employer liability in a hostile work environment claim where (1) employer exercised

13

reasonable care to prevent and promptly correct harassing behavior; and (2) an employee unreasonably fails to take advantage of a preventative or corrective opportunity).

Finally, Gray fails to establish that the alleged harassing conduct was related to his medical condition. In his Response, he references temporal proximity, but has not set forth any evidence that his co-workers were aware of his medical conditions so as to establish any connection. As such, his hostile work environment claim fails.

## C. Failure to Accommodate

### a. Standard

"To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) [he] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015).

"When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 468–69 (5th Cir. 2021) (quoting *EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009)). Employers violate the ADA when they are "unwilling[ ] to engage in a good faith interactive process." *Id.* (citation omitted). But employers are "free to" provide a "less expensive accommodation or the accommodation that is easier for it to provide" and need not provide "the employee's preferred accommodation." *Id.* (citation omitted). And "an employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) (quoting *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999)).

### b. Analysis

Plaintiff argues SAS failed to accommodate his mental health condition by "categorically" denying his request to work from home, by denying his request to work in an unoccupied space on SAS's campus, and by "requiring" that he return from medical leave on January 14, 2024 after he submitted documentation from his healthcare provider requesting an extension of his leave through mid-February 2024. Doc. 41, pp. 7-8. SAS asserts Gray is not a qualified individual with a disability as a threshold matter. Doc. 39, pp. 18-19. SAS also asserts that it undertook an individualized assessment of Gray's request for remote work but did not grant it because it would have excused him from performing the essential function of his job requiring in-person collaboration. *Id.* at pp. 19-20. SAS further responds by stating that no private office space was available at the time of Gray's request, and by asserting that Gray caused a breakdown in the interactive process by agreeing to return from leave on January 14, 2024 rather than engaging with its Employee Relations department. *Id.* at pp. 20-21. The Court will address each argument in turn.

Gray fails to establish that he is a qualified individual under the ADA. Under the ADA, a "qualified individual with a disability" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Galvan v. City of Bryan, Tex.*, 367 F.Supp.2d 1081, 1090–91 (S.D. Tex. July 15, 2004); 42 U.S.C. § 12111(8). An essential function of the Technician I position is "significant face-to-face communication under high priority circumstances;" as a result, "Technicians work from one large room specifically to communicate quickly and avoid delays." Tab C, ¶¶4, 10.[5] "[T]here is

---

[5] In determining what constitutes "the essential functions of the job," courts are required to give "consideration . . . to the employer's judgment." 42 U.S.C. § 12111(8); *see also Credeur v. La. Through Off. of Att'y Gen.*, 860 F.3d 785, 792 (5th Cir. 2017) (Courts "must give greatest weight to the 'employer's judgment'").

general consensus among courts, including ours, that regular work-site attendance is an essential function of most jobs." *Credeur v. Louisiana*, 860 F.3d 785, 793 (5th Cir. 2017). Full-time teleworking "is rarely a reasonable accommodation." *Hayes v. GSTEK, Inc.*, 175 F.4th 603, 608 (5th Cir. 2026) (citing *Rauen v. U.S. Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 896 (7th Cir. 2003)). When "requested by the employee, the reasonableness of telework cannot be presumed." *Id.* at 608. Gray  does not address how he would be able to perform these essential functions from a remote environment or a private office, but rather argues that he was qualified because he met production targets throughout his employment. Doc. 41, pp. 5-6, 8. Because he was not a remote worker during these times that he alleges he met production targets, Gray fails to address the crux of SAS's argument. Plaintiff has failed to present evidence from which a reasonable jury could find him qualified under the ADA.

Viewing the evidence in the light most favorable to Plaintiff, the Court will assume without deciding that Gray satisfies the second element of his failure to accommodate claim, requiring that SAS have knowledge of the disability and consequential limitations. *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015). However, Plaintiff cannot establish the third element of his claim: that SAS failed to provide any reasonable accommodation. *Id.* First, SAS presented competent and unrebutted evidence that its Director of Manufacturing did not "categorically" deny Gray's request to work from home, but rather assessed Gray's requested accommodation in connection with the essential functions of Gray's specific position and determined SAS could not grant the accommodation. Tab C, ¶¶4, 9-12; Ex. C-2. This iterative process is all that is required under the ADA. *See Thompson*, 2 F.4th at 468–69.

With respect to Plaintiff's argument regarding the availability of private office space, he relies only on his own opinion without establishing personal knowledge of SAS's use of its office

16

and cubicle space, and as such has not established competent summary judgment evidence defeating SAS's contention that it had no available space. Tab C, ¶11; Doc. 41-1, Ex. 1, ¶¶1-6;[6] *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). Nor has he presented evidence establishing that he would be able to perform the in-person collaboration functions of his position if permanently relocated in a private office. As such, no genuine issue of material fact exists with respect to Gray's request to work from a private space on SAS's campus.

Finally, Gray contends SAS failed to accommodate him by denying his final leave extension request. But the January 9, 2024 email correspondence between Gray and SAS indicates that, in response to Gray's submission of paperwork from his healthcare provider requesting to extend his leave through February 14, 2024, SAS stated, "If there is no plan to return to work after the most recent approval of leave through 1/12/24, a business decision will need to be made regarding next steps. Me and someone from our Employee Relations team will reach out soon." Doc. 39, pp. 7-8, 20-21; Ex. B-22, pp. 1-6. This communication does not support Gray's contention that SAS informed him that "further extension would not be granted." Doc. 41, p. 9.

In response to SAS's indication that a "business decision will need to be made regarding next steps," Gray instead cut off further discussions by responding "I plan to return to work ASAP" and inquiring about time off for a medical appointment scheduled for January 15, 2024. Ex. B-22, pp. 1-6. Gray points to no record evidence demonstrating that he informed SAS of a desire to pursue his leave extension after learning that SAS would make "a business decision" rather than automatically granting his extension request.

---

[6] Gray included an unexecuted Declaration as part of his Response in Opposition to SAS's Motion for Summary Judgment. Doc. 41-1, Ex. 1. The Declaration does not comply with the requirements of 28 U.S.C. §1746 or Fed. R. Civ. P. 56(c)(4).

Furthermore, when SAS learned that Gray had not submitted his return-to-work paperwork upon his return from leave, Employee Relations attempted to contact Gray via telephone and email to collect additional information, but Gray did not substantively respond. Tab A, 144:20-145:5. Gray's own failure to communicate interfered with the interactive process, thereby making him responsible for the breakdown. Because the breakdown is traceable to Gray, SAS cannot be found to have violated the ADA for a failure to accommodate Gray's request for extended leave. *See Caruso v. Hill Country Mental Health & Dev. Disabilities Centers*, 801 F.Supp.3d 641, 662 (W.D. Tex. Sept. 12, 2025). Gray emphasizes that SAS had in its possession the medical documentation he submitted on January 9, 2024 confirming his healthcare provider's approval of his leave extension through February 14, 2024. Doc. 41, pp. 8-10; Doc. 49, pp. 2-4. SAS does not dispute that Gray submitted this documentation. Doc. 44, pp. 3-6; Ex. B-22. But SAS was not obligated to grant his leave extension request merely because his healthcare provider approved it. Accordingly, no reasonable jury could find that SAS failed to reasonably accommodate Gray and Defendant is entitled to summary judgment on Gray's failure to accommodate claim.

### D. **Retaliation**

#### a. **Standard**

The ADA prohibits retaliation against an individual who "has opposed any act or practice made unlawful by this chapter." *Mueck v. La Grange Acquisitions, LP*, 75 F.4th 469, 488 (5th Cir. 2023) (internal quotations marks omitted) (quoting 42 U.S.C. § 12203(a)). A retaliation claim not supported by direct evidence is evaluated under the *McDonnell Douglas* burden-shifting framework. *Id.* To establish a *prima facie* case of unlawful retaliation Plaintiff must show (1) participation "in an activity protected under the statute"; (2) his "employer took an adverse employment action against" him; and (3) "a causal connection exists between the protected activity

18

and the adverse action." *Id.* (quoting *Feist v. La. Dep't of Just.*, 730 F.3d 450, 454 (5th Cir. 2013)). And if Plaintiff establishes his *prima facie* case, "the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *Feist*, 730 F.3d at 454–55; *accord Mueck*, 75 F.4th at 488 n.16.

### b. Analysis

The Court will assume without deciding that Plaintiff satisfies the first two elements of his retaliation claim. This leaves the third element for consideration: a causal connection between alleged protected activity and the adverse employment action. Gray contends he returned from an ADA-protected medical leave on January 14, 2024, opposed disability-related harassment on January 22, 2024, was suspended the same day, and was terminated approximately one week later. Doc. 41, p. 13. SAS argues Gray's report of alleged harassing conduct occurred while he was in a disciplinary meeting after having engaged in an unprofessional outburst with his co-worker, at which point his suspension was already in motion, thus undermining any causation. Doc. 39, pp. 21-22. SAS also contends Gray cannot rely on temporal proximity alone to establish his claim. *See Eubanks v. Endeavor Energy Res., LP*, No. 22-50737, 2023 WL 2612615 (5th Cir. Mar. 23, 2023) (rejecting the notion that temporal proximity alone establishes but-for causation when the burden shifts back to the employee) (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007)).

Gray also contends that a genuine issue of material fact exists regarding SAS's characterization of his January 22, 2024 encounter with Vasquez. Doc. 41, pp. 13-14; Doc. 41-1, Ex. 1, ¶8. Gray disputes SAS's contention that he engaged in an outburst with Vasquez on January 22, 2024, and asserts SAS's reasoning is pretextual. Doc. 41, pp. 13-14. The undisputed record demonstrates that SAS received reports from several different employees who used a variety of

19

phrases to describe Gray's conduct as yelling or otherwise unprofessional. Ex. D-4. SAS has also set forth evidence establishing that its leadership believed these reports to be accurate and subsequently decided to terminate Gray's employment in reliance. Tab C, ¶¶14-15; Ex. C-3.

At this stage, the appropriate inquiry is not whether Gray engaged in an unprovoked outburst towards Vasquez, but whether SAS had a reasonable basis for its non-discriminatory and non-retaliatory reason for terminating Gray and then acted in conformity. *See, e.g.*, *McKinney v. Bolivar Medical Center*, 341 Fed. App'x 80, 82 (5th Cir. 2009) (no pretext where employer reasonably believed former employee engaged in terminable behavior and acted on that belief in good faith); *Kitchen v. BASF*, 952 F.3d 247, 253 (5th Cir. 2020) (pretext inquiry is limited to whether the employer reasonably believed its non-discriminatory reason for discharge and then acted on that basis). Gray has presented no evidence suggesting SAS leadership did not believe the January 22, 2024, employee reports to be accurate at the time it terminated his employment. He merely disagrees with how his coworkers described his conduct to SAS.

Gray also argues that because SAS previously tolerated reported misconduct from him, including incidents from July 2023, October 2023, and earlier in January 2024, without terminating his employment, that terminating him after the January 22, 2024 incident establishes pretext. This argument is merely a re-hashing of Gray's reliance on temporal proximity, which is not sufficient to satisfy his burden at the pretext stage. *See, e.g.*, *Strong*, 482 F.3d at 808. Moreover, Gray's behavior escalated in that SAS employees reported two instances of concerning conduct in approximately the first week of his return from leave: the January 16, 2024 incident and the January 22, 2024 encounter. Doc. 41, pp. 11-12. Gray does not dispute that SAS believed both incidents to have occurred. Rather, he argues that because he was provided additional chances to reform his behavior in the past, SAS was obligated to continue doing so indefinitely. He presents

20

no evidence from which a reasonable jury could conclude that SAS was motivated by retaliation rather than Gray's own escalating behavior, including no evidence of a non-disabled comparator who was permitted to engage in the same or similar repeated conduct without termination. As such, his retaliation claim fails.

CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant Samsung Austin Semiconductor, LLC's Motion for Summary Judgment (Doc. 39).

It is further **ORDERED** that all of Plaintiff David S. Gray's remaining claims in the above-captioned matter—including claims for disability discrimination, failure to accommodate, hostile work environment, and retaliation under the Americans with Disabilities Act—are **DISMISSED WITH PREJUDICE**. Plaintiff's motion to amend is **DENIED**.

This is a final, appealable order disposing of all claims and all parties.

**ORDERED** that SAS's Motion for Summary Judgment is **GRANTED**.

Signed: 06/17/2026.

_____
Alan D Albright
UNITED STATES DISTRICT JUDGE